[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, William M. Earls, went to the defendant, Center Automotive, Inc. (the dealership), in October 1996, for the purpose of purchasing an automobile for his personal and family use. Bill Sawyer, a salesperson at the dealership, assisted Earls with the sale.
During the pre-sale negotiations, the plaintiff told Sawyer that he wanted a safe and reliable vehicle. Sawyer showed the plaintiff a 1989 Lincoln Continental, VIN No. 1LNCM9840KY650296 (the vehicle), and stated that the vehicle would meet Earls' needs.
The two test-drove the vehicle. The plaintiff did not notice any major problems at that time, but did notice that the air conditioner, compressor, and passenger side window did not work properly. Sawyer stated that those defects would be repaired prior to delivering the vehicle to the plaintiff. Based on Sawyer's assurances, the plaintiff agreed to purchase the vehicle for a price of $8,495 and gave Sawyer $2,025 as a down payment.
The plaintiff signed a "Retail Purchase Order for Motor Vehicle". (See Tr. Exh. 2.) On the purchase order, in the box entitled "WRITTEN PROMISES MADE TO CONSUMER," Sawyer warranted the air conditioner, compressor, passenger side window, and the "safety" of the vehicle. Additionally, the dealership provided a 30-day/1,500 mile warranty on the vehicle, which is listed on the purchase order.
The plaintiff also signed a retail instalment contract; (See Tr. Exh. 3); which disclosed the plaintiff's monthly payment amount of $272.38 and the down payment of $2,025. The retail instalment contract was assigned to Condor Capital Corp. (Condor), to which the plaintiff made five monthly payments.
On the day of the vehicle's delivery, the plaintiff drove it home with his wife, Leslie. While driving, the plaintiff hit a bump and noticed that the suspension system had serious problems. The plaintiff also noticed that the air conditioner, compressor and passenger side window had not been repaired. Additionally, when the plaintiff arrived at home, he realized that he could not get the vehicle restarted until he turned off the burglar alarm, disconnected the battery and then reconnected the battery. The plaintiff telephoned the dealership, spoke to Sawyer and complained about these problems. Sawyer told the plaintiff to bring the CT Page 11881 vehicle to the dealership and that all the problems would be repaired.
Shortly after the call, the plaintiff brought the vehicle back to the dealership. At the dealership, the plaintiff handed Sawyer a hand-written list; (See Tr. Exh. 4); of the items that needed repair. Sawyer told the plaintiff that the dealership would complete the repairs in accordance with the list.
A week and one-half later, the plaintiff telephoned the dealership to find out if the vehicle was ready for pick-up. Sawyer spoke to the plaintiff and informed him that the repairs had been made and the vehicle was ready for pickup. When the plaintiff arrived at the dealership, Sawyer presented him with a bill for $502, which the plaintiff paid. The plaintiff left with the vehicle.
Not more than two weeks later, while the plaintiff was driving with his mother and three nephews, the air-bag suspension system broke down altogether. The front of the vehicle rose up in the air while the rear of the vehicle sat on its frame. The plaintiff testified that after his suspension system collapsed he was looking skyward. Upon further inspection, the plaintiff also discovered rust underneath the seat and a defective LED readout on the radio. The vehicle was towed to the dealership at an expense of $55. (See Tr. Exh. 6.)
The vehicle remained at the dealership for three months while repairs were being performed. After the plaintiff picked up the vehicle in February 1997, the suspension completely broke down again. The vehicle was towed back to the dealership at a cost of $139. Because this was the same problem that the plaintiff had been complaining about all along, the plaintiff requested that the dealership repair the defects in accordance with the written warranties. The dealership refused, claiming the warranty had expired. Subsequently, the plaintiff informed the dealership and Condor that, because of the many defects and the dealership's subsequent refusal to repair the vehicle, he was revoking his acceptance and would be making no more payments under the contract.
In Count I of his complaint, the plaintiff seeks his actual, consequential and incidental damages pursuant to the Uniform Commercial Code (UCC); General Statutes §§ 42a-2-714 and 715; on account of the dealership's breach of warranty of fitness for a particular purpose; see General Statutes § 42a-2-315; breach of express warranty; see General Statutes § 42a-2-313; and breach of implied warranty of merchantability; see General Statutes § 42a-2-314. In the alternative, in Count II, the plaintiff seeks a revocation of acceptance of the contract in accordance with General Statutes. § 42a-2-608. Because Condor has settled the plaintiff's claims against it, part of CT Page 11882 which included releasing the plaintiff from all liability under the retail instalment contract, the plaintiff seeks only his actual, consequential and incidental damages.
The plaintiff contends that breach of any one of the warranties described above entitles him to the relief he seeks. The plaintiff testified concerning a breach of all applicable warranties. The plaintiff further contends that he has proven by the evidence that he has established a breach of all warranties.
Section 42a-2-315 provides: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 42a-2-316 an implied warranty that the goods shall be fit for such purpose." In this case, the plaintiff told Sawyer that he wanted a safe and reliable vehicle. Sawyer asserted to the plaintiff that the vehicle was safe and reliable, and he knew that the plaintiff was relying on him to provide such a vehicle. The plaintiff was credible concerning Sawyer's representations regarding the safety and reliability of the vehicle. Accordingly, an implied warranty of fitness for a particular purpose, safety and reliability was created by the dealership.
The vehicle had numerous mechanical failures relating to the suspension, air conditioner and electrical systems. The suspension-related defects were so substantial that the plaintiff could not operate the vehicle. The electrical system defects caused the plaintiff to be unable to operate the vehicle without having to disconnect the alarm system and battery and then reconnect the battery. The evidence establishes that the vehicle was neither safe nor reliable. Accordingly, the dealership breached the implied warranty of fitness for a particular purpose.
The plaintiff further contends that the dealership breached the express warranty in violation of § 42a-2-313, which provides: "(1) Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. (c) Any sample of model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model."
On the purchase order; (See Tr. Exh. 2); the dealership wrote under the CT Page 11883 section entitled WRITTEN PROMISES MADE TO CONSUMER, "Safety, air/cond., Compressor, passenger side window." Accordingly, the dealership expressly warranted that the vehicle would be safe, and that the items listed would be repaired. The plaintiff testified that he relied on the dealership's assurances that the vehicle would be safe and that the specific items would be repaired, and these representations caused the plaintiff to purchase the vehicle. In fact, the dealership's assurances became part of the basis of the bargain. After three repair attempts over three months in the repair shop (out of the four that Earls had "possession" of it), none of the listed defects had been repaired and the vehicle was never safe to operate. Accordingly, the dealership breached the express warranty.
Lastly, the plaintiff contends that the dealership breached the implied warranty of merchantability, in violation of § 42a-2-314, which reads, as follows: "(1) Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. (2) Goods to be merchantable must be at least such as . . . (c) are fit for the ordinary purposes for which such goods are used."
The evidence established that the dealership is a dealer in used automobiles and is therefore a merchant within the meaning of § 42a-314. In this matter, the vehicle was not fit for the ordinary purpose for which it was intended. The plaintiff testified, and the court finds, the suspension problems were so severe that the vehicle could not be driven. Further, the vehicle would not start without the plaintiff disconnecting and reconnecting the battery. Here, the vehicle was not fit for the ordinary purpose for which it was intended, normal and reliable driving.
The plaintiff seeks a revocation of acceptance of the vehicle. The plaintiff testified that he made five monthly payments, had use of the vehicle for only one month and the dealership refused to make any more repairs. He then revoked acceptance and ceased making the monthly payments. The plaintiff contends that his revocation of acceptance was proper.
Section 42a-2-608 allows a buyer to revoke acceptance of goods if "(1) the nonconformity with the goods substantially impairs the value of them; and, (2) acceptance of the goods; a. with discovery of the defect, if the acceptance is on the reasonable assumption that the nonconformity will be cured; or, b. without discovery of the defect, when the acceptance is reasonably induced by the difficulty of the discovery before acceptance of by the seller's assurances; and (3) within a reasonable time after a nonconformity was discovered or should have been CT Page 11884 discovered; and, (4) revocation before a substantive change occurs in the condition of the goods not caused by their own defects."
In this case, the plaintiff testified that the value, use, and safety of the vehicle were substantially impaired. The plaintiff accepted the vehicle after discovering some of the defects, and with a promise from the dealership to repair them. However, the dealership never made the repairs. When the plaintiff accepted the vehicle he was, however, not aware of the major defects, the suspension and the vehicle's ability to start. Despite three subsequent repair attempts, the dealership failed to adequately fix the vehicle. It then refused further repairs improperly citing the expiration of the warranty as the reason for its refusal. The plaintiff then revoked acceptance and informed the dealership and finance company that he would make no more payments. This was done after the plaintiff had made five monthly payments. In Conte v. DwanLincoln-Mercury, Inc., 172 Conn. 112, 374 A.2d 144 (1976), the Supreme Court held that the buyer's revocation of acceptance of a vehicle after fourteen months was not improper when there were a continuous series of negotiations and repairs and the delay in notice did not prejudice the seller. The present case is controlled by Conte and therefore the plaintiff's revocation of acceptance was too late.
The plaintiff seeks his incidental and consequential damages. See General Statutes § 42a-2-715. The plaintiff testified that he is seeking a return of the $2,025 down payment he made to the dealership, the five monthly payments he made of $272.37 each (for a total of $1,361.85), the two tow bills of $55 and $139 ($194 total), $502 that the plaintiff paid the dealership for ineffective repairs, and $1500 for the three months the plaintiff was without the use of the vehicle, which, for the purposes of this action, the plaintiff values at $500/month. Accordingly, the plaintiff is entitled to the sum he paid towards the purchase price and his incidental and consequential damages, not including attorney's fees, for a total of $5,582.85.
The plaintiff brought Count II in the alternative to Count I because the elements of Count II are duplicative of the elements in Count I, the plaintiff needs to prove the same facts and seeks the same relief — his actual, consequential and incidental damages, or $5,582.85. Because this amount was awarded above, the plaintiff cannot also recover it under Count II.
In Count V, the plaintiff Earls seeks actual damages, costs, reasonable attorney's fees, and punitive damages for the dealership's violations of CUTPA, General Statutes § 42-110g. There is ample evidence that the dealership engaged in unfair and deceptive acts in commerce or trade in connection with this transaction. CT Page 11885
As a threshold issue, there must be some ascertainable loss of money or property. The plaintiff's testimony establishes that he paid tow fees as a result of the defendant's conduct. Had the dealership provided him a safe and reliable automobile, as it had promised, it is unlikely that any tow fees would have been incurred. Additionally, had the dealership properly made the repairs in accordance with the warranty, there would have been no need to have the vehicle towed a second time. Further, the plaintiff was without a vehicle for at least three months, yet he continued to make the monthly payments. Accordingly, the plaintiff has sufficiently proved that he has suffered an ascertainable loss.
The plaintiff's testimony also establishes that the dealership engaged in unfair and deceptive acts, in violation of CUTPA, first, it lied to him about the history of the vehicle, telling him that it had not been flood damaged when in fact, it was. The dealership also misrepresented to him the mechanical condition of the vehicle. The dealership told him that it was a safe and reliable vehicle when it knew or should have known of its major defects. After each of the three repair attempts, it told the plaintiff that the vehicle had been repaired properly, however, the vehicle's condition remained unchanged. This court concludes that the dealership did nothing at all to the vehicle at each of the various repair attempts.
Finally, the Connecticut state department of consumer protection promulgated regulations in connection with the sale of motor vehicles by used car dealers. Misrepresentations concerning the nature, characteristics, and quality of vehicles offered for sale are a violation of § 42-110b-28 (b) (17) of the Regulations of Connecticut State Agencies, and such violations are deemed to be unfair and deceptive acts and practices in violation of CUTPA. The dealership misrepresented the vehicle's history, safety, and reliability. Accordingly, the dealership is deemed to have committed unfair acts and practices pursuant to §42-110g.
The plaintiff is entitled to actual damages, reasonable attorney's fees and punitive damages. As stated above, the plaintiff's actual damages are $5,582.85, which he has been awarded in Count I. The plaintiff is now moving for an award of attorneys' fees; (see Plaintiff's Motion for Award of Attorneys' Fees, dated June 27, 2001); and punitive damages pursuant to CUTPA.
The Connecticut Supreme Court has allowed for the award of punitive damages under similar circumstances. See Tessman v. Tiger LeeConstruction, 228 Conn. 42, 53-54, 634 A.2d 870 (1993). Tessman involved a new home construction case where the builder repeatedly refused I to CT Page 11886 repair obvious defects with the home. In Tessman, the Supreme Court, citing the trial court's conclusions, found that "the defendants attempted to stonewall the plaintiffs. . . . [t]hey made no real substantive type repairs, ignored the plaintiffs' requests, [and] took advantage of the plaintiffs." Id., 55. The Supreme Court went on to state that "the defendants' actions clearly rise above simple negligence and support a finding of reckless or intentional conduct by the defendants to the plaintiffs' detriment." Id.
Similar to Tessman, the dealership here made no real attempt to repair any of the complained of problems. It subsequently refused to repair problems that the plaintiff had complained of all along, citing the expiration of the warranty as its reason. Its actions in this case were not simple negligence, but rather it intentionally denied the plaintiff the protection of the warranties that it provided him. Accordingly, the court awards the plaintiff punitive damages in the amount of $11,164.00 and attorney's fees in the amount of $8,326.24.
Angelo L. dos Santos Judge of the Superior Court